## CHARLES N. HOLDEN *et al.*

*v.*

## THE BOARD OF COMMISSIONERS OF COOK COUNTY.

DEVISE—*for insane asylum, who will take bequest.* When, at the time of making a devise of real estate to any insane asylum which should be organized, located and established in the future by virtue of some State or municipal authority, or some charter which might give the institution permanence, counties had no authority whatever to establish such insane asylum, it was *held*, that a county having a branch of its poor-house set apart for keeping its insane paupers, and which, subsequently to the will, erected an additional building upon the poor-farm, was not entitled to the devise, it not being such an institution as was contemplated by the bequest, and that the Northern Insane Asylum was entitled to the same.

APPEAL from the Circuit Court of Cook county; the Hon. WILLIAM W. FARWELL, Judge, presiding.

This was a bill filed by the appellees, " The Board of Commissioners of Cook County," to compel Thomas B. Bryan, as trustee under the will of Jonathan Burr, deceased, to convey to appellees a certain bequest, and the appellants, trustees of the Northern Illinois Hospital and Asylum for the Insane, located at Elgin in this State, resist the same on behalf of that institution, claiming that it is entitled to the bequest.

The part of the will making the bequest is as follows :

" To Thomas B. Bryan I give, demise and bequeath the east half of the east half of lot number 6, in block number 33, in the original town of said city of Chicago aforesaid, with the buildings and improvements thereon, to have and to hold the same to him, his heirs and assigns forever, but in trust, however, to and for the following uses and purposes, namely : in trust, to hold, manage and improve the same, and the net annual income thereof to invest, and the same to hold until such time as an insane asylum shall be organized, located and established in the northern part of the State of Illinois, under and by virtue of some State or municipal authority, or some charter which shall give to the institution a character of permanence and stability ; and then in further trust, to convey and transfer the said premises and the accumulated income therefrom to the authority or corporation managing and controlling said asylum, but in trust, however, to hold, manage, improve and invest the same, and the net annual income thereof to use and expend in and towards keeping and maintaining such asylum in a condition to relieve those who are so unfortunate as to need its treatment and care.

"And, in case an effort, reasonably promising success, shall be made by some competent authority to establish such an asylum, the said trustee is hereby authorized, at his discretion, to aid it from time to time in the erection of suitable buildings therefor, to the extent of the net income of said property which may

be in his hands; but in case such an asylum shall not be established and put in full and successful operation within six years after my decease, then, in further trust, to convey and transfer said premises and the net accumulated income therefrom to my executors hereinafter named, or the survivor and survivors of them, the same to be, by them, sold and conveyed, and converted into money and cash securities, and the proceeds thereof divided among and paid over to the several institutions and corporations hereinafter named the recipients of the residue of my estate as hereinafter devised and bequeathed, and in the proportions in which they are, respectively, hereinafter made the recipients of the said residue, and to be held by them respectively upon the same trusts, and for the same purposes as hereinafter declared."

The date of the will was December 31, 1867. The testator resided in Cook county and died February 4, 1869. It appears by the record that from a date long prior to the making of the will, Cook county had maintained a county poor-house upon the poor-farm of the county, using several buildings thereon which were built prior to 1865, one of them being used as a poor-house for sane paupers, and the others for insane paupers. At the time of the making of the will the county had three buildings upon this poor-farm,—one of brick, for sane paupers, another of brick with a wooden addition, the addition being used for insane paupers, and another of frame, also used for such insane.

On the 26th of September, 1868, the committee on poor-house and paupers submitted a report to the Board of Supervisors of Cook county that they realized that more room was needed at the county house for the insane, and recommended that said committee be authorized to erect such buildings or additions as were needed for the accommodation of the insane; which was concurred in, and steps were afterward taken for the erection of a new building.

On April 16, 1869, the act was passed entitled "An act to establish the Northern Illinois Hospital and Asylum for the

Insane," $125,000 being appropriated for it. Cook county endeavored to secure the location of this State asylum, but failed, and the Northern Illinois Hospital and Asylum for the Insane was located at Elgin, in May or June, 1869, and vigorously pushed forward to completion, except as prevented from going on by an injunction from the time of the location until December 23, 1869, when the injunction was dissolved. The plans were adopted December 28, 1869. It was occupied in January, 1872, and patients received in April, 1872. It has been completed at a cost of some $559,000 and will accommodate four hundred and fifty patients. Insane are received from Cook county and the whole State, each county being entitled to a certain number.

June 19, 1869, a committee was appointed by the Board of Supervisors of Cook county "to select a location for an insane asylum exclusively for the use of Cook county," and they were also to confer with Mr. Bryan in regard to the bequest in question. Sept. 14, 1869, the committee on poor-house and paupers submitted a report that they had selected a site for the asylum on the poor-house farm; it was about twenty feet from where its insane department was then located. Contracts were awarded, and thereupon the new building progressed until it was completed, in December, 1870, at a cost of some $212,000, and the insane with their attendants were transferred to it from the old buildings. It has a capacity for two hundred patients. The court below decreed in favor of the bill, and this appeal was taken by the defendants.

Mr. WILLIAM H. HOLDEN, for the appellants.

Mr. JOHN M. ROUNTREE, for the appellees.

Mr. JUSTICE SHELDON delivered the opinion of the Court:

The General Assembly of the State, in the revision of 1874, p. 307, sec. 25, clause 5, authorized counties to erect and provide for a county insane asylum. Previous to that time, counties possessed no such authority; but they had the power to

erect and maintain a county poor-house, and other necessary buildings in connection therewith, and to establish and maintain a farm for the employment of the poor.    It was by virtue of the last named power that Cook county erected the building which it denominates an insane asylum, and for which, as such, it lays claims to the bequest in controversy.

This building is but a branch of the poor-house of Cook county, one in which are kept separately a particular class of its poor, the insane.    True, it appears that some few paying patients have been admitted, but this was without authority of law.    The bequest was not to any existing institution, but it was to an insane asylum which should be "organized, located and established" in the future, by virtue of some State or municipal authority, or some charter which should give to the institution a character of permanence and stability.    As an institution, this so called insane asylum in Cook county was just as much "organized, located and established" a long time before the making of the will, as it was subsequently. Previous thereto, there were the separate buildings upon the poor-farm, in which the insane poor were separately kept.

Subsequently to the will, there was only erected an additional building upon the poor-farm, and it called an insane asylum . It was but an enlargement of previously existing accommodations for insane paupers    There was a formal location of the precise site of the building subsequently, but this did not meet the idea of location as mentioned in the bequest.    The language of the bequest contemplates an institution to be established under and by virtue of some "authority" to establish and maintain an insane asylum, and as before observed, counties, previous to 1874, had no authority in this regard.

Cook county was the home of the testator; the arrangements there for the care of its insane poor had existed for a long time previously, separate buildings being established and maintained for the purpose, and may reasonably be presumed to have been known to the testator when he made his will.    If the so called insane asylum in Cook county comes within the

intendment of the bequest, the inquiry naturally arises, why, then, was not the bequest made to Cook county, for the use of its insane poor?

All the difference between now and then is, that the present building is larger and more expensive and commodious than the former one, and it is called an insane asylum. It is quite restricted in its character, being only for a particular class, the insane paupers of Cook county, and is really no more than a department of the poor-house. It was not changed in char-acter by bestowing upon it the appellation of insane asylum. We are of opinion that it does not meet the requirements of the language of the bequest, and that it is not an institution of that character which was contemplated by the testator as an insane asylum.

And under the second clause of the bequest, too, we are of opinion the Northern State Insane Asylum would be entitled to it on the ground of priority. That clause provided, that in case an effort reasonably promising success should be made by some competent authority to establish an insane asylum, then the income of the property should go toward the erec-tion of the buildings, and contemplating evidently that it should have the property itself upon being put in operation within the time specified.

The passage of the act of April 16, 1869, by the General Assembly, for the establishment by the State of the Northern insane asylum, constituted, we think, such an effort as is above named, entitling that institution to the income toward the erec-tion of its buildings, and to the property itself, on going into operation, as it did, within the time limited. It was some time after the passage of this act when the county of Cook first conceived the project of erecting its so called insane asylum, and of thereby securing this bequest. The fact of the sooner completion of its building should not, we think, displace the priority gained by the other institution.

The decree will be reversed, and the cause remanded for fur-ther proceedings in conformity to this opinion.

*Decree reversed*